Filed 2/18/26  In re J.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re J.C., A Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. T.B., Defendant and Appellant. | E086993 (Super.Ct.No. J295620) OPINION |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Michelle Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant.

Laura Feingold, County Counsel, and Helena C. Rho, Deputy County Counsel, for Plaintiff and Respondent.

1

T.B. (father) appeals from an order terminating parental rights over his minor child. He argues the juvenile court abused its discretion by declining to continue the Welfare and Institutions Code[1] section 366.26 hearing to allow a bonding study. We affirm.

## BACKGROUND

This appeal concerns father's child J.C. (born 2016). J.C. has two half siblings who are not at issue in this appeal.

In January 2023 J.C. was living with mother and his two half siblings, but not father. Father was a truck driver who was often gone working, but he would visit J.C. when he had time off.

On January 5, 2023, the department took J.C. and his two half siblings into protective custody after police raided their mother's home. As to J.C., the dependency petition includes allegations under section 300, subdivisions (b) and (g). Specifically, the department alleged mother had a substance abuse problem that placed J.C. in danger, that father knew or should have known about this substance abuse problem and failed to protect J.C., and that he left J.C. without provision for support.

When the department asked J.C. who his father is, J.C. said " 'I have two dads,' " identifying father as one of them. The other was the father of one of J.C.'s half siblings; J.C. had witnessed that father's murder. He could not recall the last time he saw father.

---

[1] Unlabeled statutory citations are to the Welfare and Institutions Code.

Father reported he saw J.C. about once every two or three weeks for an hour or two at a time. Father recalled that at their last meeting J.C. told him " '[y]ou're not my dad,' " and father "admitted he reacted inappropriately . . . and told him to, 'Have your dad buy you everything I just bought you then.' " Father did not provide a home address, and he requested the department assess his out-of-state relatives for placement. Father explained this was in part because "he did not believe his current home was suitable for [J.C.] because it was near the area where [J.C.] witnessed," the murder of his half sibling's father.

At the contested jurisdiction and disposition hearing, the court sustained the allegations against mother and the allegation that father failed to protect J.C. from mother's substance abuse, but dismissed the allegation that father left J.C. without provision for support. It removed J.C. from both parents' custody and ordered reunification services.

During the six-month review period father made progress on his case plan. He said he regretted his "minimal presence in his son's life," and acknowledged that he " 'should have made more effort.' " Father's visits were consistent and the department did not note any issues or concerns.

During the 12-month review period father continued to make progress. However, the department remained unable to confirm father's housing arrangements. In January 2024, father told them he found new housing but did not provide an address. The department did not report any issues with visits. It remained concerned about father's

3

housing situation and his long, inflexible work hours, but nevertheless recommended continuing reunification services.

By the 18-month status review period, father had still not provided any evidence of stable housing despite claiming he had two homes and even suggesting he wanted a home assessment. The department reported that "[w]hile [ ] father has made minimal progress, he continues to lack stable housing . . . and does not appear ready to resume his parental role."

At the 18-month status review hearing, the court terminated father's reunification services. It also granted father visitation for six to eight hours a week.

The department conducted a monthly visit of the caregiver's home in October 2024. The caregiver said that when pressed, J.C. admitted to lying to his caregiver about where he goes with father on visits, and that he goes to father's house rather than the park. This concerned the department because the visitation order required visits to happen in the community and father insisted visits were not happening at his home. The department then spoke to J.C., who said he went to father's house every week and spends most of his visit there. J.C. said he plays video games and watches TV, and nobody else is home. When asked whether he ever wanted to return to father's care, he said " 'yes, he has one room but he's going to get a bigger house and going [to] build it." He liked visits, liked spending time with father, and felt safe.

In December 2024 the court changed father's visits to supervised and reduced them to two hours every week because father violated court orders by having visits at his home.

Things began to deteriorate at this point. Father started ending visits early or canceling/rescheduling at the last minute. This created behavioral issues with J.C., particularly if father canceled at the last minute. Father did not get J.C. a Christmas present, but told him he would get a Nintendo Switch "if he sa[id] that he want[ed] to live with father." At a supervised visit in February 2025, father brought photos of family members and "said 'this is your family' in a forceful aggressive way." Later, after two canceled visits, J.C. said he did not want to go to the next one. That visit lasted only 15 minutes, and the one after that only 40 minutes due to J.C.'s refusal. Father asked J.C. why he did not want to go to visits, and then told him " 'you have mental issues.' "

In April 2025 while the department was speaking to J.C.'s caregiver J.C. approached and asked " 'can I stay here forever?' " He referred to his caregivers as "mommy" and "daddy." When the department spoke to J.C., he repeated that he wanted to live with his caregivers forever, said he likes the house and that they are family. The department asked J.C. whether he wanted to live with father and J.C. said no. The department then explained what adoption was, but J.C. remained quiet.

Later that month the court continued the section 366.26 hearing. In response to a request from mother's counsel for a bonding study, the court ordered "the child be made

5

available for a bonding study, as long as the bonding study does not create a need for a continuance."

From May to August 2025 visits between father and J.C. continued to be mostly unsuccessful. Father's visits became more regular, but the supervisor reported that "father does not really talk to [J.C.]," and just lets him play on father's phone. J.C. continued to say he did not want to go to visits, sometimes asking " '[d]o I really have to go?' " At one point J.C. told father he wanted to stay with "mommy" (meaning his caregiver) and father told him " 'they're not your real family.' " Father then canceled a visit for the 4th of July weekend, as well as the next weekend's visit, and J.C. responded " 'he can't make it? He wonders why I don't want to go.' " Father also did not show up for at least one scheduled visit. J.C. told the department he does not like going to visits with his father, that he feels safe in his caregivers' care, and that he wanted to be adopted by them.

On August 18, 2025, exactly four months after the court first ordered J.C. be made available for a bonding study, father's counsel asked "the Court for authority to make the minor available for a bonding study." The court told father's counsel it had already made such an order on April 18, then repeated the order verbatim—including that it would only permit a bonding study if it did not create a need for a continuance. It then set a contested section 366.26 hearing for September 25, 2025.

After the August 18, 2025 hearing, father's counsel contacted an expert to perform a bonding study and notified county counsel the expert would be in touch to schedule it.

6

The expert also tried to contact the department. After two weeks, the department had still not gotten in touch with the expert. Following multiple emails between the parties, father was able to schedule a bonding study for September 19, 2025.

Sometime in September during a visit father referred to J.C.'s caregivers as "mother [e]ffers." This upset J.C., and afterward visits were held at the department's offices. J.C. also refused to visit father twice, citing this incident. On September 12, 2025 J.C. told the department " 'I'm already with my family and tia is adopting me. I feel good, I feel safe, loved, I'm with family." The department asked again whether he wanted his caregivers to adopt him, and explained that meant their home would be his forever home, and he confirmed that he wanted them to adopt him.

When the time came for the bonding study, J.C. refused to participate, again citing the father's comments about the caregivers. J.C. agreed to allow father to apologize while the bonding study expert observed. Father apologized and gave J.C. some food. He and J.C. then hugged and said they loved each other. The bonding study expert reported the apology seemed to have a positive impact and there was some sign of affection between father and J.C., but "[g]iven the shift in the child's demeanor post apology, there may be more to learn about." The bonding study expert said they needed more observation time "to determine the type of attachment that exists."

The court held a contested section 366.26 hearing on September 25, 2025. Father's counsel requested a continuance to complete the bonding study. The court denied the request, saying it would not be in the child's best interests because the parties

7

had had since April to complete a study, the section 366.26 hearing had already been continued a number of times on unrelated issues, and the minor "has clearly reported to the social worker what his feelings are in this case and what he wants to see going forward."

The court then heard testimony and argument on whether there was a beneficial relationship between father and J.C. such that the court should not terminate father's parental rights. At the end of the hearing, the court concluded father did not meet either the second or third prong of the beneficial relationship exception and terminated his parental rights.

ANALYSIS

Father argues the trial court abused its discretion when it denied a continuance to allow completion of the bonding study. We disagree.

A court may grant a continuance in dependency proceedings so long as that continuance is not "contrary to the interest of the minor" and the party requesting it shows good cause. (§ 352, subds. (a)(1)-(2).) "In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (§ 352, subd. (a)(1).)

"We review the juvenile court's decision to deny a continuance for abuse of discretion. [Citation.] 'Discretion is abused when a decision is arbitrary, capricious or

8

patently absurd and results in a manifest miscarriage of justice.' " (*In re D.Y.* (2018) 26 Cal.App.5th 1044, 1056.)

Here, it was not an abuse of discretion to deny the continuance because we agree with the court that such a continuance would not have been in J.C.'s best interest. The record is clear that J.C. wanted to be adopted by the prospective adoptive parents, did not want to continue visiting with father, and seemed ready for the process to be over. His preference for adoption thus mirrored the law's. In other words, while the law requires us to assume J.C. has a substantial interest in resolving the proceedings as quickly as possible in order to obtain the benefits of adoption, we need not assume here: J.C. expressed that this was his actual preference. Because the law assumes that proceeding quickly is in the minor's interest, and the minor himself stated that it was in his interest, it was not an abuse of discretion for the court to find that a continuance would have been contrary to those interests.

In addition, father had plenty of time to complete a bonding study and plenty of warning that the court would not grant a continuance if one was not completed. The court first ordered the parties to make J.C. available for the bonding study in April, but father did not start trying to schedule a study until August. Father argues this is because he was unaware that the court's original order making J.C. available for a bonding study applied to father as well as mother. Regardless, father waited until just over a month before the section 366.26 hearing to clarify this, and to seek such a study, despite knowing that the court was unlikely to grant a continuance if one was not completed.

9

Nevertheless, father argues the court was compelled to grant the continuance because it ordered a bonding study. "The juvenile court's discretion to order a bonding study arises from Evidence Code section 730," which requires the court to find "that the expertise is, or may be, required to resolve issues in the case" to justify appointment of an expert. (*In re S.R.* (2009) 173 Cal.App.4th 864, 869.) Thus, if the court had ordered a bonding study, it would have implicitly found that such expertise was necessary, so proceeding without it might have presented a problem.

But the court did not order a bonding study. The court's specific order was that "the child be made available for a bonding study, as long as the bonding study does not create a need for a continuance." In other words, the court did not find a bonding study was necessary, nor did it appoint an expert per Evidence Code section 730. Rather, it ordered the parties to cooperate with each other if they wanted to pursue a bonding study on their own. Thus, the court did not need to wait for the results of a bonding study—and in fact told the parties it would not wait.

Finally, though we find no error, even if we did it would be harmless. We may only reverse the court's order denying a continuance if it prejudiced a party, meaning it would have been reasonably probable there would have been a different result if it had been granted. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *In re J.I.* (2003) 108 Cal.App.4th 903, 913.)

Father sought a continuance to bolster his arguments against terminating his parental rights. Avoiding termination would have required father to show that

10

termination of parental rights " 'would be detrimental to the minor' due to any of certain specified circumstances." (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249.) One such circumstance, the parental bond exception, applies where the parent can show they "have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) There are three elements to this exception: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*In re Caden C.* (2021) 11 Cal.5th 641, 631, italics omitted.)

Here, there is no reasonable probability father could have established the beneficial parental relationship exception applied, even with a continuance and a bonding study. Before the dependency, father and J.C. had a limited relationship; father was not part of the household and he was often out of town for work. During the dependency, J.C.'s relationship with father only deteriorated. By the end of the dependency, father's visitation became erratic, and J.C. told the department repeatedly that he did not want to visit father and wanted to be adopted. It is thus unlikely that father would have been able to prove either of the latter two prongs of the exception applied. On this record, it is pure speculation to think the bonding study might have made a difference.

Accordingly, we affirm the order terminating parental rights.

DISPOSITION

We affirm.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL _____
J.

We concur:


MILLER _____
Acting P. J.


LEE _____
J.

12